UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TODD M. KORBEL | CIVIL ACTION |
| VERSUS | NO. 06-7283 |
| LEXINGTON INSURANCE COMPANY | SECTION "N" (4) |

**ORDER AND REASONS**

Before the Court is Defendant's **Motion for Summary Judgment (Rec. Doc. No 35)**. This motion, which was opposed, was set for hearing on September 12, 2007, without oral argument. After reviewing the memoranda of the parties and the applicable law, this Court finds that this motion should be granted in part and denied in part.

**I.      Factual Background and Procedural History**

In 2002, Plaintiff Todd M. Korbel (hereinafter, "Korbel" or "Plaintiff"), a member of the Louisiana bar, purchased the property located at 430-432 Olivier Street in New Orleans, Louisiana (hereinafter referred to as "the property") for approximately $123,000. He made this purchase with cash borrowed from family, and he did not take out a conventional mortgage. After purchasing the property, which had not been occupied for years, Plaintiff began renovating it. Korbel lived at his parents' house, although he occasionally slept at the property when he was working late on renovations. He kept the majority of his personal belongings in storage. Korbel admits that the property was not his principle place of residence.

1

In November of 2002, Plaintiff purchased homeowner's insurance for the property from Defendant Lexington Insurance Company (hereinafter, "Lexington" or "Defendant") through Defendant's agent, Leithman-LeBoeuf Insurance, Inc. ("Leithman-LeBoeuf"). Plaintiff claims he advised Leithman-LeBoeuf that he had decided to perform some work on the property when he purchased the insurance. Plaintiff notes that Lexington renewed the insurance annually from November, 2003, through November, 2007, despite being aware of the ongoing work being done on the property.

When Hurricane Katrina struck, Korbel was still in the process of renovating the property. In fact, on August 29, 2005, roughly two-thirds of the property was gutted, including the bathrooms and kitchen. The property sustained damage due to wind and rain only; no flood damage was sustained. Korbel ultimately filed suit against Lexington to recover money for unpaid damages and other relief.

**II.     Law and Analysis**

   A.     Legal Standard - Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed.R.Civ.P. 56(c). See also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

Initially, the movant bears the burden of demonstrating the absence of material fact issues. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir.1993). The movant is not required, however, to negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (citing *Celotex*, 477 U.S. at 323). If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *Celotex*, 477 U.S. at 325. If the movant meets his burden, then the burden then shifts to the nonmovant, who, to avoid summary judgment, must go beyond the pleadings and designate specific facts that show that there is a genuine issue for trial. *Little*, 37 F .3d at 1075 (citing *Celotex*, 477 U.S. at 325). Of course, unsubstantiated assertions do not constitute competent summary judgment evidence. *Abbott*, 2 F.3d at 619 (citing *Celotex*, 477 U.S. at 324).

Before granting a motion for summary judgment, the district court must be satisfied that no reasonable trier of fact could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 249; *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (stating that "the facts and inferences [must] point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict"). In determining whether a material issue of fact exists, the evidence and all inferences drawn therefrom must be considered in the light most favorable to the non-moving party. *Baker v. American Airlines, Inc.*, 430 F.3d 750, 753 (5th Cir.2005) (quoting *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir.2005)).

 B. <u>Lexington's Motion</u>

Although Korbel admits Defendant paid him the policy limits under Coverage A (dwelling)

and also paid him what he was owed under coverage B (other structures), he claims that the monies he received were not received timely. (Exhibit A to Defendant's motion, pp. 157-158). Plaintiff further claims that he is still owed money under coverage C (personal property) and coverage D (additional living expenses). Lexington has filed the instant motion for summary judgment, seeking to dismiss all of Plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure, claiming that there are no genuine issues of material fact in dispute, and summary judgment should be awarded in its favor as a matter of law.

### (1) Plaintiff's claims for personal property under coverage C and additional living expenses under coverage D of the policy.

Korbel claims he was not adequately compensated under coverage D, which provides for the recovery of additional living expenses in certain circumstances. Lexington claims Plaintiff is not entitled to additional living expenses because Plaintiff never resided at the property and, therefore, did not suffer any additional living expenses as a result of the damage to his home. Further, Lexington notes that even when he evacuated from Hurricane Katrina, Korbel lived in an apartment his father rented. (Exhibit A to Defendant's motion, pp. 190-91). However, despite its current assertions, Defendant nonetheless tendered Plaintiff over $20,000 in additional living expenses - even though they now assert that these additional living expenses were never owed to him under coverage D. Thus, Lexington argues that Korbel's claim under coverage D for damages exceeding the amount it has already paid to him under this coverage should be dismissed.

Lexington further notes that Plaintiff is claiming that he was underpaid over $9,000 under coverage C (personal property). Lexington does not directly oppose Plaintiff's contention that he is owed monies under coverage C; however, it argues that the amount Korbel claims he is owed under coverage C is less than the amount Lexington claims it overpaid under coverage D. Thus,

4

Lexington asserts that any fact issues relating to coverage C are immaterial as Korbel was still paid more than he was owed under the policy.

In opposition, Korbel asserts that Defendant's policy is clear and unambiguous and affords additional coverage to him for damage to his personal property and for his additional living expenses. Plaintiff notes that the section of the Lexington policy pertaining to "Coverage C-Personal Property" begins with "[w]e cover personal property owned or used by an 'insured' while it is anywhere in the world." However, Defendant attempted to limit its exposure for the damage to Plaintiff's personal property to 10% of his personal property limits by claiming that the property was "usually located at an 'insured's' residence other than the 'residence premises.'" Plaintiff argues that Lexington's homeowner's policy does not specifically define "residence." His personal property that was damaged by Katrina was not located at a "residence". Instead, it was located in storage at a public storage facility. Thus, Korbel contends that the 10% percent limit Lexington attempts to apply for an alternative residence is not appropriate, and additional monies are owed for his damaged personal property.

As for coverage D, Korbel claims that the homeowner's policy clearly anticipates an insured being able to make a claim for additional living expenses whether or not the "residence premises" is the insured's principal place of residence. Plaintiff's insurance policy states:

> Coverage D - Loss Of Use
>
> The limit of liability for Coverage D is the total limit for all the coverages that follow.
>
> 1. If a loss covered under this Section makes that part of the "residence

> premises" *where you reside*[1] not fit to live in , we cover, at your choice, either of the following. However, if the "residence premises" is not your principal place of residence, we will not provide the option under paragraph b. below.
>
> > a. Additional Living Expense, meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or
>
> > b. Fair Rental Value, meaning the fair rental value of that part of the "residence premises" where you reside less any expenses that do not continue while the premises is not fit to live in.

(Exhibit C to Defendant's motion, p. 3 of 18). Because Korbel never resided at the property, the Court concludes that the policy clearly and unambiguously provides that he is entitled to neither additional living expenses nor fair rental value. Thus, summary judgment is granted in Lexington's favor to the extent that Plaintiff's claim for any *additional* damages under Coverage D is dismissed.

As for the damages Plaintiff claims he is owed under coverage C, Lexington has failed to cite authority supporting its assertion that overpayment under one coverage (here, coverage D) necessarily moots underpayment under another (here, coverage C). Thus, summary judgment is denied as to Plaintiff's claim for damages under coverage C.

### (2) Plaintiff's Claims Regarding "Bad Faith" Penalties and Damages Pursuant to La. R.S. 22:658 and 22:1220.

On or about September 26, 2005, Korbel first contacted Lexington by telephone to notify it of the loss. (Exhibit A to Defendant's motion, p. 85). On October 13, 2005, a representative of Defendant's third party adjuster called Korbel, and a new adjuster, Teresa Paul, was assigned to the claim. (Exhibit A to Defendant's motion, pp. 88-94). On that same day, Paul called Plaintiff and

---

[1] The Court notes that the three words "where you reside" were left out of the quotation citing this portion of the policy in Plaintiff's opposition. (See Rec. Doc. 40, p. 16). This Court considers this to be a *material* omission.

6

arranged to meet with him on October 26, 2005. (Exhibit A to Defendant's motion, p. 99). The inspection occurred on that date, at which time Paul gave Korbel her name and contact information and advised him that she was going to begin adjusting his claim. (Exhibit A to Defendant's motion, p. 101). She also told Korbel that the adjustment process would proceed more quickly if he obtained an estimate for the replacement of the entire roof. *Id*. She further advised him to get an estimate for re-siding the house with Hardie-Plank siding, for painting the house, and for replacing certain windows. (Exhibit A to Defendant's motion, pp. 102-03). Plaintiff attempted to obtain estimates and spoke with Paul several times in mid-to-late December of 2005. (Exhibit A to Defendant's motion, p. 104). Korbel was unable to reach Paul by telephone in mid-January; however, he did not attempt to reach her by email or fax - even though she had previously provided him with that contact information. (Exhibit A to Defendant's motion, p. 105).

On January 25, 2006, Plaintiff called Lexington's customer service line and was informed that he did not have a claim number and that his claim was "on hold." (Exhibit A to Defendant's motion, pp. 104-05). Within a week or so of that call, Steven Butler called Korbel and arranged a re-inspection of the property on March 3, 2006. (Exhibit A to Defendant's motion, pp. 115-16). On February 4, 2006, Lexington tendered a check to Korbel for additional living expenses in the amount of $2500. (Exhibit A to Defendant's motion, p. 114). After the March 3, 2006 re-inspection was performed by Butler, Plaintiff received checks from Lexington dated May 6, 2006, including $70,024.76 for Coverage A ("dwelling") and $3,448.02 for Coverage B ("other structures"). (Exhibit A to Defendant's motion, pp. 120-21; Exhibit 4 to Exhibit A). Plaintiff received nothing for coverage C (personal property) and testified that this was because he informed Butler that the majority of his personal property was in storage and was covered by "additional insurance".

7

(Exhibit A to Defendant's motion, p. 129). Plaintiff apparently told Butler to "wait and see what they [the other insurer] pay me first and then you'll know how much you owe me." *Id*.

Two months after receiving the May 6 checks, Korbel sent Lexington a letter explaining why he thought Defendant's tenders were insufficient. Plaintiff included some supporting documentation - including a roof estimate - but neglected to include the other estimates initially requested by Paul. (Exhibit 8 to Exhibit A). Defendant asserts that Plaintiff's July 18, 2006 letter was the first proof of loss submitted by Plaintiff, as admitted by Korbel in his deposition (See Exhibit A to Defendant's motion, pp. 146-47); however, he now disputes this as he claims the inspections and the photographs taken therein served as sufficient proofs of loss). In response, Lexington tendered additional amounts to Plaintiff in August of 2006. (Exhibit A to Defendant's motion, p. 156). Defendant eventually paid the policy limits under coverage A, and during his deposition, Plaintiff testified that what Defendant paid him under coverage B was "OK." (Exhibit A to Defendant's motion, p. 158).

Lexington claims that even if Plaintiff could establish that it breached a duty owed to him, he cannot establish that Lexington acted arbitrarily, capriciously, or without probable cause, necessary to recover penalties. Specifically, Lexington claims it initiated loss adjustment within 30 days of notification. It paid Plaintiff all he was due (the limit under Coverage A; and Plaintiff admitted he was satisfied with the amount tendered under coverage B). Further, Defendant claims that Korbel was paid more than he was owed on Coverage D, which is more than the amount Plaintiff now claims he was owed on coverage C. Essentially, Lexington claims it paid Plaintiff *more* than he was actually owed *within 30 days of receiving a satisfactory proof of loss*. Thus, Defendant claims it is entitled to summary judgment on Plaintiff's claim under La. R.S. 22:658 and La. R.S. 22:1220.

8

In opposition, Korbel argues that Defendant takes no responsibility for its mishandling of his claim. He claims Lexington waited almost seven months after its first inspection of Plaintiff's property to tender any money to him. In reference to Defendant's argument about not receiving a satisfactory proof of loss until later, Korbel claims that Defendant received satisfactory proof of loss for the purposes of La. R.S. 22:658 and 22:1220 during its repeated inspections on October 12, 2005, October 24, 2005, and March 3, 2006. He further claims that the money he did receive on May 6, 2006 was insufficient to repair the damages to his property. Plaintiff asserts that in Louisiana, a proof of loss occurs when an insurer is apprised of sufficient facts to place defendant on notice of the existence of a claim. Thus, Korbel contends that during the three inspections, satisfactory proofs of loss were made when Defendant inspected the property and received the photographs taken of the damaged property.

Plaintiff further claims that Lexington has violated its duty of good faith and fair dealing by misrepresenting its homeowner's policy provisions relating to personal property and additional living expenses under coverages C and D of the policy. As for Coverage D, Plaintiff notes that Defendant had no problem paying him monies for this and even went so far as to leave Plaintiff's claim for additional living expenses open in case additional monies needed to be paid. Plaintiff claims it was only after he filed suit that Defendant attempted to avoid payment of his additional living expenses. As for Coverage C, Korbel asserts that Defendant's misinterpretations of its own policy provisions with regard to personal property and additional living expenses constitute bad faith. Thus, he claims summary judgment is not appropriate as to his claims under La. R.S. 22:658 and La. R.S. 22:1220.

This Court concludes that summary judgment should be granted as to Plaintiff's claim for

penalties and attorneys fees. As Lexington notes in its reply memorandum, Korbel does not contest that Defendant initiated loss adjustment within 30 days of Plaintiff notifying it of a loss. Korbel does not dispute that Lexington's adjuster requested certain estimates on October 26, 2005; however, he did not provide any of those estimates until July 18, 2006. Further, Plaintiff does not dispute that Lexington paid him within 30 days of receiving the July 18, 2006 written proof of loss. Plaintiff now contends that the photographs taken by the adjusters should have served as satisfactory proofs of loss; however, he fails to refer the Court to a case wherein that has been accepted.[2] Through its own research, the Court has located the case of <u>Curole v. Louisiana Citizens Property Insurance Corp.</u>, 2007 WL 625933 (E.D. La. Feb. 23, 2007), wherein the court found that a plaintiff had complied with FEMA's proof of loss requirement by submitting photographs. However, that case differs from this one because in <u>Curole</u>, the plaintiff submitted a written proof of loss form, but neglected to attach receipts, cancelled checks, etc. The <u>Curole</u> Court held that Plaintiff's attached photographs were enough to satisfy the documentation requirement.

Here, Korbel claims that the photographs *alone* should have served as a proof of loss. However, Plaintiff's insurance policy itself states that one of an insured's "duties after loss" is to "[s]end to us, within 60 days of our request, your signed, sworn proof of loss, which set forth ... detailed repair estimates." (Exhibit C to Defendant's motion, p.10 of 18). Lexington requested repair estimates in October of 2005 and did not receive any such estimates from Plaintiff until July 18, 2006. Lexington tendered monies to Korbel timely after a written, satisfactory proof of loss was

---

[2] The Court notes that Plaintiff does refer the Court to three cases that purportedly establish that proof of loss occurs when an insurer is apprised of sufficient facts to place it on notice of the existence of a claim. (See Plaintiff's Opposition, fn. 74). However, these cases do not stand for the proposition that photographs or inspections *alone* are sufficient to satisfy a proof of loss requirement, which is the main issue here. The cases, further, do not suggest that specific contractual language creating requirements for the proof of loss should be disregarded in lieu of photographs and/or inspections.

10

received.  Thus, Plaintiff's claims for penalties and attorneys fees is denied in this regard.

As for penalties and attorneys fees under coverage C, Korbel admits to having told Defendant to "wait and see what they [the other insurer] pay me first and then you'll know how much you owe me" in regards to this coverage. (Exhibit A to Defendant's motion, p. 129).  Last, because the Court has concluded that no additional monies shall be paid under coverage D (and that no monies were actually ever owed to Plaintiff under coverage D, as he did not "reside" at the property), Plaintiff's claim for penalties and attorneys fees under that section of the policy should be dismissed as well.

### (3) Plaintiff's Claim of Consequential Damages (claim to be entitled to full amount of the damages to his property - caused by delay in properly and fairly adjusting the claim).

Korbel claims that Lexington owes him consequential damages to pay for additional damage to his property, which was caused by Defendant's failure to timely compensate him for his losses under the policy.  Because this Court has determined that Defendant did not fail to timely pay Plaintiff for his damages, this claim is dismissed.

### (4) Plaintiff's claim for Mental Anguish Damages

In his first amended complaint, Korbel claims that Lexington is liable for mental anguish damages, which he valued in his initial disclosures at $36,000 and noted that it was increasing $2,000 per month.  Plaintiff admits that he has not seen a mental health professional and is not taking any medication for his alleged mental condition. (Exhibit A to Defendant's motion, p. 198). He claims his mental anguish was caused by watching the house that he loved and worked on deteriorate.  Lexington claims that the decision to not repair his home was Korbel's.  It also notes that under Louisiana law, mental anguish damages are not generally available in "failure to pay"

11

insurance cases. In opposition, Korbel alleges that Lexington and its adjusters treated his claim like it was "some sort of a game". (See Opposition, p. 20). Plaintiff argues that there are genuine issues of material fact pertaining to whether or not Defendant acted arbitrarily, capriciously, and/or in bad faith in its handling of his claim.

Because the Court has concluded that Lexington did not breach a duty of good faith and fair dealing (as it timely paid Plaintiff's claim), Plaintiff's recovery of mental anguish damages (which rests on Defendant's alleged wrongful handling of Plaintiff's claim) should be dismissed. Accordingly,

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. No 35)** should be **GRANTED IN PART and DENIED IN PART** for the reasons stated above.

New Orleans, Louisiana, this 4th day of October, 2007.

**KURT D. ENGELHARDT**
**United States District Judge**